## Case No. 3,596.

### The DAVID MORRIS.

[1 Brown, Adm. 273.] [1]

District Court, E. D. Michigan. Feb. Term, 1871.

COLLISION IN ATTEMPTING TO PASS A RAFT—COSTS.

1. A tug, having five vessels in tow, while running down a narrow, crooked channel, at a speed, with the current, of about seven miles an hour, overtook and attempted to pass a raft of timber in tow, moving at the rate of four and a half miles an hour, and occupying about one-half the width of the channel. One of the vessels grounded upon the port bank, and the one next astern ran into and injured her: *Held*, that the tug was in fault (1) for not sooner discovering the raft, and that it was in motion; (2) for attempting to pass it in a narrow channel.

2. The colliding vessel, not being affirmatively shown ·to have been negligent, cannot be held in fault.

3. Where the libellant claimed $70, and recovered but 30 cents, and the respondents claimed a larger amount of damages than they were able to prove: *Held*, that neither party should recover costs.

Libel for towing. The libel alleged the towing of the ·bark by libellant's tug, the I. U. Masters, from Lake Huron to Lake Erie, August 30th, 1868, and claimed seventy dollars for that service. The answer of Rufus K. Winslow and others, owners and claimants of the bark, admitted the towing as alleged, but denied that the same was worth the amount claimed, or that there was anything due libellants on account thereof, and claimed a recoupment to the full amount of the value of the service on account of damages alleged to have been suffered by the bark in consequence of unskillful towing. The facts as deduced from the pleadings and evidence, were as follows: The contract as to price was at the usual rate, which was seventy dollars. There were five vessels in the tow, the bark David Morris being the fourth, and the brig Standard the fifth. A raft of square timber, also passing down, in tow of the tug Clark, was overtaken in the narrow channel across the St. Clair flats, in the twilight of the morning of August 30th, 1868. The channel at this point is about three hundred feet wide. The raft was six to eight hundred feet long, and one to two hundred feet wide, and was passing down the channel nearest its starboard bank, but the tail of it was swinging slowly to port. The tug Masters attempted to pass ·with her tow on the port hand side of the raft. The first two vessels of the tow went clear; but the third being the one next ahead of the bark, fetched up on the port bank of the channel. This made it necessary for the bark to starboard her helm, and fetch up also on the port bank, in order to avoid a collision with the vessel forward of her, which she did. ·The bark having thus fetched up, the vessel behind her,

---

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

the Standard, ran into her, hitting her in the stern, and causing damages, to repair which cost the owners of the bark $69.70. The tugs and their tows were moving with the current, which, at that point, was about two and a half miles per hour. The tug Clark, with the raft, was moving through the water about two miles per hour, making her total speed about four and a half miles per hour. The tug Masters, with her tow, was moving through the water about four and a half or five miles per hour, making her total speed about seven or seven and a half miles per hour. The tug Clark was seen by the mate of the Masters when at least two miles distant, and was then taken by him to be a tug aground. It was not ascertained on board the Masters that the Clark was moving and what she had in tow until within about half a mile of her.

H. B. Brown, for libellant.
Wm. A. Moore, for respondents.

LONGYEAR, District Judge. The question is, was the tug in fault for attempting to pass the tug and raft as she did; and were the collision and damage caused thereby? Here was a narrow, crooked channel, the banks of which were submerged on each side by a broad expanse of shoal water, and difficult of navigation even in broad daylight, and navigated safely at any time only by the aid of stakes and other guides. The tug was approaching this channel, with its large tow of five vessels, the entire length of which was not far from 1,800 feet, and moving with the current at a speed of between seven and eight miles an hour. Ahead of her was another tug, just entering the channel with a raft of timber of large dimensions, filling nearly or quite one-half the channel. Without slackening her speed, or waiting for the tug and raft to pass through the channel and into the open water beyond, where there was plenty of room to pass, she overtook the latter, and, at the very narrowest and most difficult part of the channel, attempted to pass, and the catastrophe happened. Surely some good excuse must be made to appear, in order to hold the tug faultless under this state of facts.

It is claimed, in exoneration of the tug: 1. That, when the raft was first seen, the distance was so short that it was impossible for the tug to check down and reduce her speed, so as to allow the raft to pass through and out of the channel ahead of her, without great risk, if not the certainty of the vessels of the tow being thereby caused to run into each other, and that therefore such an emergency existed as demanded a prompt decision of the officer in charge of the tug, and that, although he might not have decided upon the course which may now appear to have been the best, yet, if he was not guilty of negligence in coming to the conclusion he did, there is no liability. The

court recognizes this doctrine as a sound one when the emergency is sudden, and the best way out of it is really a question of doubt. But in such a case the vessel charged with fault must be in no way responsible for the emergency. In this case the tug Clark, which had the raft in tow, was seen from the tug Masters long before the emergency happened; and in addition to this the evidence is clear to my mind that, with a proper lookout upon the Masters, the raft could and would have been seen from her long before it is stated by her officers to have been seen. When the tug Clark was first seen from the Masters, it was the duty of those in charge of the latter to keep a close watch upon the movements of the former, and ascertain, at the earliest possible moment, whether she was aground, as at first suspected, or not, and if in motion, whether she had anything and what in tow. The Clark was moving at the rate of four and a half miles per hour; and in the relative position of the two to each other, and to the bends of the river, she must have been moving diagonally across the bows of the Masters, so that, by the exercise of ordinary diligence, it could have been discovered almost immediately that the Clark was in motion, and that she was moving towards the entrance to the narrow channel. The raft had upon it a house some eight or ten feet high, built of boards, for sheltering the men. This was also in motion, of course, and with the commonest care and attention would have been seen almost, if not quite, as soon as the tug which had it in tow. These rafts, with houses on them, are not unusual on these waters, but, on the contrary, are of very common occurrence, and hence there was no difficulty in determining at once what it was the Clark had in tow. This would have afforded ample time for the speed of the Masters to have been checked down to that of the tug and raft, so as to have allowed the latter to pass through the channel first, without any possible danger to the vessels in tow of the Masters. The time and distance would have been so ample as to leave no room for doubt as to the duty of the officer in charge of the Masters to so check her speed. Therefore, if the Masters did find herself in the emergency claimed, in which there was reasonable doubt as to which was her duty, whether to check her speed or go ahead, she is herself responsible for the emergency, and can, of course, claim nothing on account of it.

In this view of the case it is unnecessary to determine whether the emergency claimed really existed or not. But I think if we were to inquire into it we should find it difficult to determine it in favor of the tug. According to the testimony of those on board the tug, the raft was seen when at least half a mile ahead. Some of the witnesses state it less than that, but I think, taking libellant's testimony altogether, that is about the proof. The relative speed of the tug and tow

to that of the tug and raft was about three miles per hour, not to exceed that. The wind was blowing a stiff breeze nearly ahead. The expert testimony is clear to my mind, that in these conditions there would have been no difficulty whatever in checking the speed of the tug and tow down to that of the tug and raft, in ample time, without the least danger to the vessels of the tow, and that when so checked down the speed would still have been ample for steerage way. That it was the duty of the officer in charge of the tug so to check down, if he could with safety, there is no question; that he could have done so with safety, is so evident, not only from the expert testimony but from the nature of the case, that I think there was hardly room for such a doubt in the mind of a competent officer as the court ought to recognize. At all events, the danger of undertaking to pass the raft with such a tow was so much greater than that of attempting to check down, that the tug ought certainly to have made the attempt to do the latter.

2. The second position taken in exoneration of the tug is that the collision was caused solely by the fault of the Standard, in not either starboarding and fetching up also on the bank, or porting and running out into the stream in time, so as by the one manoeuvre or the other to go clear of the bark after she had fetched up, and that therefore whether the tug was in fault or not, for attempting to pass the raft, she is not liable for the damages done by the collision. The difficulty in maintaining this position is the want of proof of fault on the part of the Standard. The tug being in fault for attempting to pass the raft, as already found, the burden was upon her to show that the collision and damage were not caused thereby. The proof shows that the David Morris fetched up about abreast of the tail end of the raft, with insufficient room between for the Standard to pass, rendering it inevitable that if the latter had ported and passed to the starboard of the former, she must have collided with the raft. Hence her only course was to starboard and fetch up on the bank if possible. There is no proof that she did not attempt to do this, or that her failure to do it was on account of an unskillful attempt. Neither does it appear what her condition or situation was when the emergency arose, so as to be able to judge whether she might have effected the manoeuvre in time. It must be remembered that the tug is responsible for the emergency, and that the burden is upon her to show affirmatively and not by inference merely, that the Standard might have avoided the bark. Not having done so, she is not exonerated.

I hold therefore, that the collision and damage to the bark were caused by the fault of the tug in attempting to pass the raft, and that the owners of the bark are entitled to have the expenses incurred for repairs thereby made necessary deducted from the amount due the tug for towage, and that the tug is entitled to a decree for the balance. The right of libellant to be paid for the towage, and the right of claimants to have deducted therefrom expenses for repairs arose at the same time, and therefore interest can be computed only on the balance.

| | |
|---|---|
| The proof shows that the price of the towage was | $70 00 |
| Expenses of repairs | 69 70 |
| Balance due libellant | 30 |

A question was raised as to the costs, and it is contended on behalf of respondents that, under all the circumstances of this case, they should recover costs. As a general rule the allowance of costs in admiralty is the same as at common law, that is, the prevailing party shall recover costs. But in the exercise of its equitable power, admiralty may hold each party to pay his own costs, or even the prevailing party to pay costs. 1 Pars. Shipp. & Adm. 544, and note 2. In this case the real contest has been as to the liability of the tug for the collision and the consequent damage to the bark. Upon that issue the libellant has failed, and, instead of the respectable sum claimed by him, he recovers a merely nominal amount. I think, under these circumstances, it would be inequitable to require the respondents to pay his costs. On the other hand the respondents claimed a larger amount for expenses of repairs than they were entitled to. It may have been, and probably was, by mistake, but this does not help them any on the question here presented. I think they are not entitled to costs. Equity and fair evenhanded justice in this case require that each party should be left to pay his own costs. The Boston [Case No. 1,672]; The Nimrod, 24 Eng. Law & Eq. 589; The Cynthia Ann, Id. 579. Decree for libellant.